990 A.2d 640 (2010)
201 N.J. 281
STATE of New Jersey in the interest of C.V.
A-6 September Term 2009.
Supreme Court of New Jersey.
Argued January 5, 2010.
Decided March 22, 2010.
*641 Daniel V. Gautieri, Assistant Deputy Public Defender, argued the cause for appellant (Yvonne Smith Segars, Public defender, attorney).
J. Vincent Molitor, Assistant Prosecutor, argued the cause for respondent (Robert L. Taylor, Cape May County Prosecutor, attorney).
Teresa A. Blair, Deputy Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (Anne Milgram, Attorney General, attorney).
*642 Justice LaVECCHIA delivered the opinion of the Court.
New Jersey's Code of Juvenile Justice provides a comprehensive scheme that empowers Family Part judges to tailor dispositions toward aiding and rehabilitating juveniles charged with delinquent acts, while simultaneously ensuring protection of the public from dangerous and/or repetitive juvenile offenders. In this appeal, we consider a narrow sentencing issue that arose in the context of a juvenile delinquency adjudication: an issue that highlights the overarching flexibility of juvenile dispositions and the manner in which that flexibility may be employed to promote the legislative goals embodied by the Code.
C.V. became involved with the juvenile justice system when she was fourteen years old and, over the course of two years, she spent time in multiple state facilities, including temporary shelters, residential programs, and detention centers. A single Family Part judge presided over her case nearly from beginning to end, providing continuity and patience throughout a difficult case. During the court's management of the matter, after several informal and formal probationary periods failed to curb C.V.'s misconduct, the court imposed a suspended sentence to be served at the State Training School for Girls. Part and parcel of its suspension of the custodial sentence, the court extended probation for C.V. and ordered her to attend a residential treatment program. However, after two residential programs terminated C.V.'s participation and she was charged with additional violations of probation, the court entered a final adjudication of delinquency and directed that she serve her custodial suspended sentence.
The sentencing dispute that arose then, and is our focal issue now, concerned C.V.'s request for credit on her suspended sentence for the time that she spent in the two residential treatment programs. The court awarded C.V. credit for her time in detention and in court-ordered shelter, but denied her request for additional credit for the time spent in the residential programs. Although sympathetic to the request, the court considered itself constrained by Rule 5:21-3(e), which addresses the mandatory award of day-for-day credit on a juvenile's custodial sentence, as interpreted by State ex rel. S.T., 273 N.J.Super. 436, 642 A.2d 422 (App.Div.), certif. denied, 138 N.J. 263, 649 A.2d 1284 (1994). According to Rule 5:21-3(e), the court must award a juvenile credit on a custodial sentence for "time served in detention or court-ordered shelter care between apprehension and disposition." In the court's estimation, C.V.'s residential placement was neither a detention nor a shelter care and, therefore, credit for time served was not appropriate.
C.V. appealed the denial of additional credits. Although the matter had become moot because C.V.'s sentence had been completed, the Appellate Division determined that the issue was both likely to recur and one of importance in the administration of juvenile justice. Addressing the issue on the merits, the panel affirmed.
C.V. filed a petition for certification, which was granted. 200 N.J. 207, 976 A.2d 384 (2009). We agree with the Appellate Division that the question raised is one of public importance and likely to recur. See, e.g., Joye v. Hunterdon Cent. Reg'l High Sch. Bd. of Educ., 176 N.J. 568, 583, 826 A.2d 624 (2003) (electing to resolve moot issue of public significance and likely to occur again). Although our decision will not impact C.V., this case provides a useful opportunity for underscoring that family courts have flexibility when imposing sentence on a juvenile subject to a suspended sentence.

*643 I.

A.
C.V. was living with her grandmother in 2005 when she became involved with the juvenile justice system. The many interactions between C.V. and the family court are set forth in detail below. Viewed in their entirety, one cannot help but observe how supremely difficult it can be to identify, for some juveniles, a dispositional result that will secure the rehabilitative goal of the juvenile justice system. Yet, that is the task that Family Part judges take on for every juvenile brought before the court: for each, the court endeavors to map the rehabilitative and therapeutic path that will lead the child out of the juvenile justice system. For C.V., that path was particularly difficult to identify.
Beginning on May 11, 2005, C.V. first pled guilty to simple assault and disorderly conduct arising out of an incident that occurred at her high school. A family court hearing officer imposed a sanction of informal probation for one year, requiring C.V. to abide by her grandmother's rules while she lived in her grandmother's home. Soon after, however, C.V. returned on a violation of probation for leaving home for twenty-four hours without permission, violating curfew, and disobeying household rules. The same hearing officer referred C.V. to the Family Crisis Intervention Unit for a possible shelter placement, and required C.V. to attend anger management classes and to work with a mentor. Informal probation was continued.
C.V. first appeared before the family court on December 13, 2005, for a second violation of her informal probation. She again had disobeyed household rules and, although C.V. had enrolled in an anger management course as required, she was failing to attend regularly. After spending a week in a shelter pending court review of the violation of probation charge, C.V. was ordered into an Intensive Supervision Program (ISP), and to be monitored via an electronic ankle bracelet.
One month later, C.V. returned to the family court on criminal charges for assault and unlawful weapons possession. C.V. pled guilty to fourth-degree possession of a weapon (knife) for an unlawful purpose, N.J.S.A. 2C:39-5(d). The court converted C.V.'s informal probation into formal probation and continued electronic monitoring. The court also directed ISP to provide additional forms of therapy to C.V. and ordered appropriate fines and penalties.
After only another month had passed, C.V. again violated probation, her first violation of formal probation. The violation concerned an incident at school. C.V. also had failed to pay the fines and penalties associated with her weapons-possession charge. The court imposed a six p.m. curfew through ISP for thirty days and required C.V. to send a letter of apology to her teacher. Formal probation was continued.
A week later, the court held a hearing on a second violation of probation for multiple curfew violations, failure to attend school, and continued failure to pay fines and penalties. As an incentive to encourage C.V.'s compliance with its orders, the court continued ISP for one week pending disposition of the plea hearing, but promised C.V. that it would eliminate ISP if she complied with probation for the one week. If C.V. did not comply, her probation officer was directed to take her to detention. Before the week ended, however, C.V. again violated the terms of her probation by having alcohol in her bedroom.[1] After *644 consideration of the applicable aggravating and mitigating factors for sentencing purposes, the family court sentenced C.V. to sixty days in the Bridgeton Detention Facility.
The next step for C.V. occurred on August 1, 2006, when a review hearing was conducted. By the time of that hearing, C.V. had been reviewed and approved for acceptance into the Youth Consultation Services (YCS) program in Atlantic City for a period of one year. She was fifteen years old. At the review hearing, the court remanded C.V. to a shelter pending her placement at YCS and scheduled another review hearing for fourteen days later. Before that next review hearing occurred, however, a third violation of probation was filed against C.V. for absconding from the shelter. She pled guilty to that violation on August 15, 2006. For the first time, the court imposed a nine-month suspended sentence in the State Training School for Girls. The court also extended probation another year, conditioned on C.V.'s successful enrollment in, cooperation with, and completion of the YCS residential treatment program, scheduled to begin on August 21, 2006.
Sadly, C.V.'s fourth violation of probation occurred less than a month later. C.V. had started at YCS and, shortly thereafter, been dismissed from the program on September 4, 2006, for misconduct. A September 5, 2006, hearing about that dismissal revealed that five of the nine girls enrolled in YCS were dismissed on the same day as C.V. That information prompted the family court to delve deeper into the circumstances surrounding C.V.'s dismissal and the court ordered YCS to produce certain records. Also, because the court learned that C.V. had self-inflicted cuts on her arm, the court sent her to a local hospital for a mental health screening and remanded her thereafter to the Bridgeton Detention Facility. The violation of probation hearing was continued to September 12, 2006.
C.V. ultimately pled guilty to her fourth violation of probation, which had been based on her discharge from YCS for fighting. At the violation hearing, YCS represented that it would permit C.V. to return to the program as long as she did not engage in further misconduct. However, at a subsequent dispositional hearing conducted on October 3, 2006, YCS revoked that offer. The court received a report from its Alternative Disposition Committee that recommended that C.V. be given the opportunity to be placed at a different residential treatment program, but the Committee was unable to find one with available space. The State took the position that C.V. should now be required to serve the sentence that the court previously had suspended, citing the seriousness of C.V.'s misconduct at YCS, which included a fight with another YCS attendee and an assault of a pregnant staff member.[2] Instead, the court increased C.V.'s suspended sentence to twelve months, conditioned on her compliance with probation and cooperation with a residential treatment placement. The court remanded C.V. to detention to await placement in a residential program. Moreover, because C.V. was clearly beyond her grandmother's control, the court placed her in the custody of the Division of Youth and Family Services.
A few weeks later, C.V. was placed in an alternative residential program, the VisionQuest Madalyn Program for Young Women (VisionQuest). When reporting to the *645 court on C.V.'s progress, VisionQuest revealed that C.V. engaged in misdeeds similar to those she committed while at YCS. At a February 6, 2007, dispositional review hearing, VisionQuest informed the court that it would allow C.V. to continue with the program so long as she behaved, but that it would not tolerate her running away, fighting, or engaging in self-mutilation. Accordingly, the court warned C.V. that it would impose the suspended sentence if she committed any further infractions.
Less than a month later, VisionQuest discharged C.V. from the program based on her continued misbehaviors, citing as well the two assault charges pending against her. The discharge resulted in C.V.'s fifth violation of formal probation. In a last attempt to delay imposition of the suspended sentence, the court referred C.V. to the Juvenile Justice Commission (JJC) for an interview in the hope that she might be suited for placement in one of JJC's affiliated programs. However, the court flatly refused to consider another residential placement for C.V.
At an April 3, 2007, dispositional hearing, the JJC reported that, due to C.V.'s mental health problems, none of its placements were appropriate for her. Addressing the court, C.V. expressed her understanding that she had not made progress at any of the residential facilities she had attended and informed the court that she was ready to serve her suspended sentence. On entering its final adjudication of delinquency, the court sentenced her to an indeterminate term of incarceration not to exceed one year. Pursuant to Rule 5:21-3(e), the court awarded C.V. credit for the 132 days that she spent in detention, but denied her request for credit for the 144 days that she spent, in total, at YCS and VisionQuest. C.V. filed a motion for reconsideration on the 144 days. On May 7, 2007, the court denied the motion, while correcting a minor miscalculation in the number of days that C.V. spent in detention.

B.
In a written decision on the motion for reconsideration, the court addressed the arguments of counsel regarding whether C.V.'s time in the residential programs should qualify for credit against her suspended sentence. The court's decision highlighted the sentencing-credit dilemma it perceived.
The court began with a discussion of applicable legislation and internal judiciary administrative directives that addressed the manner in which courts should deal with juveniles awaiting out-of-home placements. As the court explained, N.J.S.A. 2A:4A-38(l) provides that a juvenile may temporarily be housed in a "non-secure facility" only when the juvenile awaits a disposition that does not involve transfer to a "secure residential or out-of-home placement." The court noted that the general "operative understanding over the years" of the meaning of "non-secure facility" in N.J.S.A. 2A:4A-38(l) had been "shelter care." However, questions arose about the permissibility of using other forms of temporary placement for juveniles whose dispositions remained in the realm of non-secure placements. To promote uniformity and to ensure compliance with the legislative direction in N.J.S.A. 2A:4A-38(l), an administrative directive prepared by the Administrative Office of the Courts (AOC), AOC #8-04, instructed family court judges on the permissibility of interpreting broadly the converse type of placement, that which would constitute a "secure" placement. Specifically, and as the family court here explained, the AOC Directive provided that out-of-home and residential placements that contained a security *646 component should be regarded as constituting "secure" placements. According to the family court, the AOC Directive implicitly advanced the proposition that "[j]uveniles are to be kept in the lock-up after disposition until their placements are ready without fear of transgressing the statute." The court deduced that a juvenile who remained in detention after entry of a juvenile disposition must be one either who had been sentenced to detention or who awaited transfer to the custody of a training school.
The problem that the family court believed it faced in this matter arose from its review of relevant case law. Prior to the issuance of the AOC Directive, the Appellate Division had held in S.T., supra, that a residential placement was not a "secure" facility for purposes of awarding credit under Rule 5:21-3(e) for a later violation of probation. 273 N.J.Super. at 448-49, 642 A.2d 422. Thus, the family court found itself unsure whether to follow the AOC Directive or the Appellate Division's opinion in S.T.
The court explained its dilemma as follows. The court required C.V. to remain in detention, or in residential treatment programs that had a security component, post-disposition (that is, after the court imposed a suspended sentence at the State Training School) consistent with the AOC Directive. However, the court found that S.T.'s holding required the court to deny C.V. credits under Rule 5:21-3(e) for time spent in the residential programs, notwithstanding that the AOC Directive would equate those residential programs to detention. Ultimately, the court concluded that it was bound by the direction in S.T. on the award of mandatory credits.
The Appellate Division affirmed the denial of credit for time at YCS and VisionQuest. In the panel's view, neither the AOC Directive nor N.J.S.A. 2A:4A-38(l) address the granting of credits. Therefore, the panel concluded that neither was in conflict with the decision in S.T. and that, pursuant to S.T., C.V.'s request for credits under Rule 5:21-3(e) properly was denied. We agree with the Appellate Division's assessment on the lack of any conflict as between the AOC Directive, N.J.S.A. 2A:4A-38(l), and S.T. Although we could simply affirm the Appellate Division's judgment on the narrow holding in respect of the mandatory award of credit under Rule 5:21-3(e), we choose not to end the discussion there. We write also to address, and to emphasize, the amount of discretion reposed in Family Part courts when imposing sentence on a juvenile returning to court on a suspended sentence after having violated or otherwise imperfectly performed required probationary conditions.

II.
Turning first to the Appellate Division's holding, which focused on the decision in S.T., supra, 273 N.J.Super. 436, 642 A.2d 422, a brief discussion of the facts is necessary to set that decision in context. S.T. involved a juvenile's appeal from a custodial disposition following a violation of probation. Id. at 439, 642 A.2d 422. The juvenile, S.T., specifically sought credit against his custodial sentence for the time he spent in a residential treatment facility. Ibid.
S.T. had been adjudicated delinquent at sixteen years old for committing a sexual offense. Ibid. The trial court imposed a suspended sentence and probation for "three years conditioned on the successful completion of an 18-month residential program at Pinelands Residential Group Center." Ibid. When S.T. failed to complete the treatment program, the trial court imposed a new sentence for the violation of probation and awarded S.T. credit against *647 that sentence for the entire time he spent in detention, but not for the time that he spent at the Pinelands Center. Ibid.
On appeal, S.T. argued that he deserved credit pursuant to Rule 5:21-3(e), which awards credit for time served in "detention or court-ordered shelter care," id., for the time that he spent at the Pinelands Center because "it was as restraining as if he had been in a detention center or court-ordered shelter care." S.T., supra, 273 N.J.Super. at 445-46, 642 A.2d 422. The panel reviewed the parameters of the Pinelands Center program and its emphasis on therapy and education. Id. at 446-47, 642 A.2d 422. Based on its review, the panel noted that the program entailed certain rules and physical restrictions, but determined that the program served a rehabilitative and not punitive purpose. Id. at 447, 642 A.2d 422. Moreover, as further evidence of the program's rehabilitative purpose, the panel noted that the trial judge sent S.T. to the "Pinelands program as a condition of probation, not as an incident of incarceration." Id. at 443, 642 A.2d 422. The appellate panel reasoned that if any program that imposes Pinelands-like rules and physical restrictions is considered the equivalent of a custodial or detention placement and, therefore, entitles the juvenile to day-for-day credit awards regardless of how he or she performs the conditions of probation, then the Juvenile Justice Code's rehabilitative purpose would be defeated. Id. at 444-49, 642 A.2d 422. The panel concluded that the goals of the Code would be subverted if the trial court was required to award credit for the time spent, unsuccessfully, in this type of rehabilitative out-of-home placement. Id. at 449, 642 A.2d 422. Therefore it rejected S.T.'s argument that he must receive credit for the time spent at the Pinelands Center. Id. at 447, 642 A.2d 422.
C.V., like S.T., served time in restrictive residential programs as a condition of probation. As made evident by the family court judge's multiple attempts to find a suitable residential placement for C.V. and, moreover, his delay in imposing a suspended sentence, C.V.'s placements at YCS and VisionQuest were meant to facilitate her rehabilitation. Although each program placed on her restrictions similar to those that had been imposed on S.T. at Pinelands, YCS and VisionQuest imposed those rules and physical restrictions in order to create the best environment for treatment. C.V. was never physically confined at the facilities; indeed, she succeeded in running away from both. Thus, we have no disagreement with the Appellate Division's unassailable determination that C.V.'s placements in YCS and VisionQuest do not satisfy the intended concept of detention in Rule 5:21-3(e) to qualify for mandatory day-to-day credit.
There is more to be said, however, on the flexibility that the Family Part court had available to it under the Juvenile Justice Code when resentencing C.V.

III.

A.
The Juvenile Justice Code (Code), N.J.S.A. 2A:4A-20 to -90, governs juvenile delinquency matters. The Code created a specialized Family Part court with unique expertise over juvenile matters, and granted to the Family Part courts "exclusive jurisdiction in all cases where it is charged that a juvenile has committed an act of delinquency and over all matters relating to a juvenile-family crisis." N.J.S.A. 2A:4A-24(a). The Code empowers Family Part courts handling juvenile cases to enter dispositions that comport with the Code's rehabilitative goals. State ex rel. J.L.A., 136 N.J. 370, 376-77, 643 *648 A.2d 538 (1994). Once the court adjudicates a juvenile to be delinquent, the Code permits the court to order incarceration or, in lieu of incarceration, any of twenty enumerated dispositions under N.J.S.A. 2A:4A-43(b).[3] The statute sets forth the factors that the court must weigh when determining the appropriate disposition. N.J.S.A. 2A:4A-43(a). Although not explicitly included in the statute, the Code has been found to permit suspended sentences as a necessary, viable disposition. State ex rel. M.C., 384 N.J.Super. 116, 118, 894 A.2d 60 (App.Div.2006).
One of the "major hallmarks of the Code" was to provide the newly created, specialized family court with flexibility in juvenile dispositions. Id. at 127, 894 A.2d 60. Indeed, legislative statements accompanying the draft versions of the Code emphasized that flexibility to choose among the myriad dispositions available under the Code would enable Family Part judges to accomplish the stated rehabilitative goals of the Code. See S. Judiciary Comm. Statement to Assem., No. 641, at 1 (1982) ("The language in this section combines the purpose sections in the current juvenile statutes and stresses such concepts as the preservation of the family unit and the rehabilitation of juveniles consistent with the protection of the public."). The introductory paragraph of the Senate Judiciary Committee Statement clearly announces the legislative intent to arm Family Part judges with the flexibility that comes from having a significantly broadened arsenal of dispositions to use when sentencing a juvenile offender:
This bill recognizes that the public welfare and the best interests of juveniles can be served most effectively through an approach which provides for harsher penalties for juveniles who commit serious acts or who are repetitive offenders, while broadening family responsibility and the use of alternative dispositions for juveniles committing less serious offenses. Moreover, the provisions of this bill and the other accompanying bills reflect a philosophy which is pragmatic and realistic in nature rather than bound to any particular ideology.
[Ibid.]
The abundance of available statutory dispositions reflects the general recognition that juvenile reform is not suited to a "`one size fits all' approach." See State of New Jersey, Office of the Child Advocate, Reinvesting in New Jersey Youth: Building on Successful Juvenile Detention Reform 16 (2009), available at http://www.state.nj.us/childadvocate/ publications/PDFs/Reinvesting inNJ-Youth.pdf. Indeed, judges entering dispositions are challenged by the complex, diverse, and changing needs of youth, and must confront the unique emotional, behavioral, physical, and educational problems of each juvenile before the court. Id. at 8. When making a disposition, Family Part judges must determine the most appropriate course of action in respect of the individual to "accomplish both rehabilitation and preservation of the family unit and at the same time protect society." M.C., supra, 384 N.J.Super. at 128, 894 A.2d 60. As part of the development of such a "total rehabilitative plan," the Family Part judge is authorized to consider family counseling and therapy, educational *649 and substance abuse programs, "or any other reasonable programs designed to correct family dysfunction." State v. H.B., 259 N.J.Super. 603, 607, 614 A.2d 1081 (Ch.Div.1992).
Probation is a disposition that offers the court a great amount of flexibility to achieve the Code's rehabilitative goals. See ibid.; see also N.J.S.A. 2A:4A-43(b)(3). An enumerated disposition under N.J.S.A. 2A:4A-43(b), probation provides the court with leverage over a juvenile without moving the child into a more custodial environment. Pursuant to the statute, a Family Part judge may
[p]lace the juvenile on probation to the chief probation officer of the county or to any other suitable person who agrees to accept the duty of probation supervision for a period not to exceed three years upon such written conditions as the court deems will aid rehabilitation of the juvenile.

[N.J.S.A. 2A:4A-43(b)(3) (emphasis added).]
By granting the court a vast amount of flexibility in setting conditions of probation, N.J.S.A. 2A:4A-43(b)(3) allows the court to construct requirements designed to secure appropriate behavior from the juvenile while obtaining the individualized rehabilitative and therapeutic help needed by the particular child.
It is well understood that the plain language of that section grants broad discretion to Family Part judges to impose a range of probationary conditions. H.B., supra, 259 N.J.Super. at 608, 614 A.2d 1081. When a juvenile violates probation, the Family Part retains jurisdiction to "substitute any other disposition which it might have made originally." N.J.S.A. 2A:4A-45(b); see State ex rel. A.R., 246 N.J.Super. 241, 243, 587 A.2d 288 (App. Div.1991). That concept is grounded in the adult probationary rules, governed by N.J.S.A. 2C:45-1 to  4. See A.R., supra, 246 N.J.Super. at 243, 587 A.2d 288. If, before a period of probation expires, an adult probationer fails to comply with conditions of probation, the court "may revoke the suspension or probation and sentence or resentence the defendant." N.J.S.A. 2C:45-3(a)(4). "When the court revokes a suspension or probation, it may impose on the defendant any sentence that might have been imposed originally for the offense of which he was convicted." N.J.S.A. 2C:45-3(b)(emphasis added). "[T]he sentence imposed after revocation of probation should be viewed as focusing on the original offense rather than on the violation of probation as a separate offense." State v. Ryan, 86 N.J. 1, 8, 429 A.2d 332, cert. denied, 454 U.S. 880, 102 S.Ct. 363, 70 L.Ed.2d 190 (1981). The court is not precluded from imposing a sentence shorter, or even longer, than the original sentence, if it determines that it could have imposed that particular sentence initially. See, e.g., State v. Ervin, 241 N.J.Super. 458, 575 A.2d 491 (App.Div. 1989) (finding that, upon revocation of probation, defendant could be sentenced above maximum in original plea agreement); State v. Driesse, 95 N.J.Super. 491, 231 A.2d 835 (App.Div.1967) (holding that trial court did not abuse discretionary authority when, after defendant violated terms of probation, court imposed longer sentence than originally imposed as suspended sentence for that offense).
The same principles logically apply in juvenile probationary cases. See A.R., supra, 246 N.J.Super. at 243, 587 A.2d 288; H.B., supra, 259 N.J.Super. at 610, 614 A.2d 1081. Therefore, on resentencing a juvenile on a suspended sentence, after probation has been violated or imperfectly performed, the court may impose any sentence that the court could have initially imposed. Moreover, the *650 court need not formally set aside or vacate the original sentence in order to impose a new sentence on a juvenile probationer who violated or otherwise imperfectly performed during probation. See H.B., supra, 259 N.J.Super. at 610-11, 614 A.2d 1081.

B.
Thus, because the family court has such flexibility on resentencing a probationer following a violation of probation, there was no reason for the family court below to have felt constrained by the mandatory-credit direction in Rule 5:21-3(e) when establishing C.V.'s sentence to be served at the State Training School. The court was not confined to the length of C.V.'s suspended sentence at the State Training School, which initially was nine months and later was increased to twelve months on C.V.'s fifth violation of probation. The original suspended sentence and later modification provided the court with a means to encourage C.V.'s compliance with the court's probationary terms while probation was in effect. See H.B., supra, 259 N.J.Super. at 611, 614 A.2d 1081 ("[C]ourts must have some means by which to encourage compliance with probationary conditions, or `the entire process may become farcical and ineffective.'" (citation omitted)). However, by no means was the court stuck with its initial suspended sentence length when it came time for the court to enter its disposition after C.V.'s fifth violation of probation. Flexibility in sentencing is, as noted, a hallmark of the Code. M.C., supra, 384 N.J.Super. at 127, 894 A.2d 60.
We hold that the Family Part court retains the flexibility, in appropriate cases, to grant a probationer who violated or otherwise imperfectly performed the conditions of probation a lesser custodial sentence than the previously suspended sentence. The court's authority to resentence provides the mechanism for that adjustment when the court believes it to be appropriate. Merely because a juvenile is not entitled to mandatory credit on his or her custodial sentence does not deprive the court of its ordinary flexibility in crafting a just sentence. In sum, the Family Part court here was limited only by the maximum statutory term provided by N.J.S.A. 2A:4A-44(d) for C.V.'s offense, namely fourth-degree possession of a weapon for unlawful purposes, which is one year for a juvenile offender.

IV.
The judgment of the Appellate Division is affirmed, as modified.
For affirmance as modified  Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA-SOTO and HOENS  7.
Opposed  None.
NOTES
[1] Because C.V. had sustained an injury while rollerblading, however, the probation officer chose not to place C.V. in detention.
[2] The record indicates that the assaulted YCS employee filed criminal charges against C.V.
[3] The Code provides guidance to judges considering whether incarceration is appropriate. N.J.S.A. 2A:4A-44 mandates that the court consider both aggravating and mitigating factors and then use its discretion to weigh those factors and impose a sentence. See State v. Jarbath, 114 N.J. 394, 400, 555 A.2d 559 (1989) (explaining that, with reference to adult offenders, aggravating and mitigating factors provide standards to "guide judicial discretion in determining" custodial sentences).