KOBLITZ, J.A.D.
*193 To preserve its constitutionality, we interpret the Juvenile Justice Code (Code), N.J.S.A. 2A:4A-20 to -92, to prevent incarceration of developmentally disabled juveniles in county detention facilities because not all counties have access to a certified short-term incarceration program. T.C., who was seventeen at the time of the offense, acknowledged his responsibility for actions that would constitute second-degree robbery, N.J.S.A. 2C:15-1(a)(1), if committed by an adult. He admitted participating with two other juveniles in the unarmed forcible theft of marijuana from the backpack of a fourth juvenile.
The Juvenile Pre-dispositional Report stated T.C. was originally classified as "[m]ultiply disabled and on the [a]utistic spectrum" beginning "around the age of [four]." A 2006 psychiatric evaluation stated T.C. would "continue to have a significant amount of autistic qualities and manifested symptoms in the Pervasive Developmental Disorder spectrum." T.C. moved through school with the designation of developmentally disabled, although at the time of sentencing, T.C. attended school regularly, worked a part-time job, and was not taking any prescribed medications. T.C.'s developmental *194 disability was disputed by the State, but tacitly accepted by the judge without a specific ruling.[2]
In exchange for the guilty plea, the State agreed to recommend a two-year probationary term, conditioned on sixty days confinement in the Ocean County Juvenile Detention Center (OCJDC). T.C. reserved the right to argue instead for sixty days of electronic monitoring rather than custody in the detention facility, and to make the legal argument at the time of disposition that he should not receive a custodial sentence because of his developmental disability. Accepting that T.C. was developmentally disabled, the court nonetheless imposed a two-year probationary term conditioned on thirty days incarceration in the OCJDC, followed by thirty days of electronic monitoring.
Because T.C. has completed the custodial term, the State argues this appeal is moot. An issue is "moot when our decision sought in a matter, when rendered, can have no practical effect on the *935 existing controversy." Redd v. Bowman, 223 N.J. 87, 104, 121 A.3d 341 (2015) (quoting Deutsche Bank Nat'l Tr. Co. v. Mitchell, 422 N.J. Super. 214, 221-22, 27 A.3d 1229 (App. Div. 2011) ). A reviewing court may decide a moot issue with respect to a juvenile appellant, however, if the issue is of public importance and is likely to recur. See State In re. C.V., 201 N.J. 281, 286, 990 A.2d 640 (2010) (electing to resolve moot issue of whether juvenile was entitled to receive credit for time served even though juvenile's sentence was complete); see also Joye v. Hunterdon Cent. Reg'l High Sch. Bd. of Educ., 176 N.J. 568, 583, 826 A.2d 624 (2003) (electing to resolve issue of whether a school's random drug and alcohol testing program passed muster under the New Jersey *195 Constitution even though plaintiff had since graduated from the school).
T.C. remains on probation, so the possibility of future incarceration for this juvenile offense exists. As significantly, incarceration of developmentally disabled juveniles is of public concern. We decide the underlying issue because it "is one of substantial importance, likely to reoccur but capable of evading review." Zirger v. Gen. Accident Ins. Co., 144 N.J. 327, 330, 676 A.2d 1065 (1996).
During the dispositional hearing, T.C.'s counsel argued the law did not permit a developmentally disabled juvenile such as T.C. to serve a custodial sentence in either a State or county juvenile correctional facility. The State argued the statute prohibited confinement of a developmentally disabled juvenile in a State facility, but not a certified county short-term detention program. Although the judge agreed with defense counsel that "incarceration is incarceration," the judge interpreted the statute to permit the short-term incarceration of developmentally disabled juveniles in an approved county detention program.
The Code governs juvenile delinquency matters. C.V., 201 N.J. at 294, 990 A.2d 640. It "empowers Family Part courts handling juvenile cases to enter dispositions that comport with the Code's rehabilitative goals." Id. at 295, 990 A.2d 640. "Once the court adjudicates a juvenile to be delinquent, the Code permits the court to order incarceration or, in lieu of incarceration, any of twenty enumerated dispositions under N.J.S.A. 2A:4A-43(b)." Ibid. When making a disposition, "Family Part judges must determine the most appropriate course of action in respect of the individual to 'accomplish both rehabilitation and preservation of the family unit and at the same time protect society.' " Id. at 296, 990 A.2d 640 (quoting State In re. M.C., 384 N.J. Super. 116, 128, 894 A.2d 60 (App. Div. 2006) ).
N.J.S.A. 2A:4A-43(c) states in relevant part:
*196 (1) Except as otherwise provided in subsections e. and f. of this section, if the county in which the juvenile has been adjudicated delinquent has a juvenile detention facility meeting the physical and program standards established pursuant to this subsection by the Juvenile Justice Commission, the court may, in addition to any of the dispositions not involving placement out of the home enumerated in this section, incarcerate the juvenile in the youth detention facility in that county for a term not to exceed 60 consecutive days....
(2) No juvenile may be incarcerated in any county detention facility unless the county has entered into an agreement with the Juvenile Justice Commission concerning the use of the facility for sentenced juveniles.
When incarceration of a juvenile is statutorily required, which is not the case here, juveniles in a county without an approved *936 program may serve the period of incarceration in a State facility, except that developmentally disabled juveniles in such counties must not be incarcerated. The court is directed to fashion an "appropriate" disposition other than incarceration for these disabled juveniles. N.J.S.A. 2A:4A-43(f)(2).
Juveniles "who are developmentally disabled as defined in paragraph (1) of subsection a. of [ N.J.S.A. 30:6D-3 ]" shall not be committed to a State juvenile facility. N.J.S.A. 2A:4A-44(c)(2). N.J.S.A. 30:6D-3(a)(1) defines "developmental disability" as "a severe, chronic disability of a person which is attributable to a mental or physical impairment or combination of mental or physical impairments."
The State emphasizes that N.J.S.A. 2A:4A-44(c)(2) states specifically that developmentally disabled juveniles shall not be committed to a State juvenile facility and, therefore, "has no bearing on T.C.'s term of incarceration in a county facility."
T.C. relies on State In re. R.M., 141 N.J. 434, 661 A.2d 1277 (1995), in support of his position that the law prohibits the incarceration of developmentally disabled juveniles in either a State or county juvenile facility. In R.M., our Supreme Court recognized that "the prohibition on the incarceration of developmentally-disabled delinquent juveniles arose from 'a concern that correctional institutions were being used as dumping grounds for offenders with serious mental limitations and/or other developmental handicaps.' " 141 N.J. at 446, 661 A.2d 1277 (quoting *197 Juvenile Delinquency Disposition Commission, The Impact of the N.J. Code of Juvenile Justice: First Annual Report 81 (1986) ). Regarding N.J.S.A. 2A:4A-44(c)(2), the Court explained that "[t]he statute prohibiting the incarceration of developmentally-disabled juveniles arose out of concern for their plight when jailed." Id. at 447, 661 A.2d 1277. The Court noted "the strong and continuing legislative and administrative concern to prevent the incarceration of juveniles suffering from developmental disabilities." Id. at 447-48, 661 A.2d 1277.
Critically, interpreting the Code to permit short-term incarceration of a developmentally disabled juvenile in a county facility but not a State facility also raises constitutional concerns, because not every county has access to an approved short-term juvenile detention program. Under the State's interpretation, and the judge's determination here, developmentally disabled juveniles in one county would be at risk of short-term detention, whereas similarly situated juveniles in other counties would not.
Nothing in the Code requires a county to establish a juvenile detention facility or contract for the use of another county's program for the purposes of short-term detention following adjudication. Under the statute's plain language as interpreted by the State, therefore, a developmentally disabled juvenile residing in a county that either has a juvenile detention facility, or has contracted with another county for the use of their juvenile commitment program, faces the risk of short-term detention following adjudication. If a developmentally disabled juvenile resides in a county that lacks a juvenile detention facility and has no contractual relationship to utilize another county's program, he or she faces no risk of short-term detention following an adjudication. Burlington, Gloucester, Passaic, Camden, Atlantic, Mercer, Cape May, Salem and Essex counties lack access to a short-term detention program.[3] Disparate treatment based solely *937 on geography *198 implicates concerns of equal protection and fundamental fairness.[4]
We review de novo the trial court's interpretation of statutes. State v. Gorthy, 226 N.J. 516, 530, 145 A.3d 146 (2016). The objective of statutory interpretation is to effectuate the Legislature's intent. State v. Rangel, 213 N.J. 500, 508-09, 64 A.3d 558 (2013). Courts should "avoid interpreting a legislative enactment in a way that would render it unconstitutional." State v. Fortin, 198 N.J. 619, 630, 969 A.2d 1133 (2009). A court should interpret a statute "in a manner that would avoid constitutional infirmities," if it "fairly can do so." Id. at 631, 969 A.2d 1133. "When necessary, courts have engaged in 'judicial surgery' to save an enactment that otherwise would be constitutionally doomed." State v. Natale, 184 N.J. 458, 485-86, 878 A.2d 724 (2005) (quoting Town Tobacconist v. Kimmelman, 94 N.J. 85, 104, 462 A.2d 573 (1983) ).
The Fourteenth Amendment of the United States Constitution provides that the States shall not "deny to any person within [their] jurisdiction the equal protection of the laws," and shall not "deprive any person of life, liberty, or property[ ] without due process of law." U.S. Const. amend. XIV, § 1. If a statute "directly impinges on a fundamental right or a suspect class, then *199 the provision is strictly scrutinized." Sojourner A. v. N.J. Dep't of Human Servs., 177 N.J. 318, 330, 828 A.2d 306 (2003) (citing City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985) ). If a statute implicates a lesser interest, federal courts ask whether it is "rationally related to legitimate government interests." Ibid. (quoting Washington v. Glucksberg, 521 U.S. 702, 728, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) ).
"Although the phrase 'equal protection' does not appear in the New Jersey Constitution, it has long been recognized that Article I, paragraph 1, of the State Constitution, 'like the [F]ourteenth [A]mendment, seeks to protect against injustice and against the unequal treatment of those who should be treated alike.' " Barone v. Dep't of Human Servs., 107 N.J. 355, 367, 526 A.2d 1055 (1987) (footnote omitted) (quoting Greenberg v. Kimmelman, 99 N.J. 552, 568, 494 A.2d 294 (1985) ). To analyze whether a statute comports with New Jersey's equal protection guarantee, courts employ a balancing test that weighs the "nature of the affected right, the extent to which the governmental restriction intrudes upon it, and the public need for the restriction." Caviglia v. Royal Tours of Am., 178 N.J. 460, 473, 842 A.2d 125 (2004) (quoting Greenberg, 99 N.J. at 567, 494 A.2d 294 ). The means selected by the Legislature must "bear a real and substantial relationship to a permissible *938 legislative purpose." Ibid. (quoting Taxpayers Ass'n of Weymouth Twp. v. Weymouth Twp., 80 N.J. 6, 44, 364 A.2d 1016 (1976) ).
Juvenile detention invokes the "fundamental right" of "personal liberty," the abridgement of which "should be avoided if at all possible." Schall v. Martin, 467 U.S. 253, 304, 104 S.Ct. 2403, 81 L.Ed.2d 207 (1984) ; see also A.M. v. Luzerne Cty. Juvenile Det. Ctr., 372 F.3d 572, 585 n.3 (3d Cir. 2004) (noting that the liberty interest in personal security and well-being applies to State-run juvenile detention facilities). Short-term juvenile detention implicates fundamental rights, because it is a total deprivation of liberty for up to sixty days. N.J.S.A. 2A:4A-43(c). If the court *200 were to apply the plain language of the statute as the State requests, the statute would impose different standards for confinement among similarly situated individuals based on geography, an arbitrary factor. Under either the federal or State equal protection analysis, the court should review such disparate administration of fundamental rights with heightened scrutiny.
The Supreme Court of the United States has cautioned against the use of differing standards for similarly situated individuals in the realm of liberty deprivation. In Jackson v. Indiana, 406 U.S. 715, 717, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972), the Court considered a litany of issues involving the constitutionality of certain aspects of Indiana's pretrial civil commitment program. The Court held that, under the Fourteenth Amendment, the fact the mentally disabled defendant had pending criminal charges did not justify subjecting him to a "more lenient commitment standard" and a "more stringent standard of release than those generally applicable to all others not charged with offenses." Id. at 730, 92 S.Ct. 1845. Indiana could not subject the defendant to a different civil commitment standard based upon an arbitrary distinction.
The Court also had occasion to review the legality of differing standards for confinement of similarly situated individuals in Baxstrom v. Herold, 383 U.S. 107, 86 S.Ct. 760, 15 L.Ed.2d 620 (1966), upon which the Jackson Court relied. In Baxstrom, the Court found the defendant was denied equal protection of the law because he was not afforded a jury trial prior to civil commitment following the expiration of his sentence, as were other New Yorkers facing civil commitment. Id. at 111, 86 S.Ct. 760. The Court found no "semblance of rationality" in the law's different commitment standards. Id. at 115, 86 S.Ct. 760.
Our own Supreme Court has recognized the constitutional implications of disparate treatment of offenders in the adult criminal context. In State v. Leonardis, 71 N.J. 85, 89, 363 A.2d 321 (1976), the Court considered three appeals that involved the validity of the pretrial intervention (PTI) programs established in Bergen and Hudson counties pursuant to the Court Rules. The appeals *201 posed questions that raised concerns about the "fundamental nature and fairness of PTI." Ibid. After resolving several specific issues with the PTI programs, the Court observed that one of the overriding causes of the deficiencies in the PTI programs was the diversity among programs engendered by the Court Rules. Id. at 120-21, 363 A.2d 321. It explained that, "within a State-administered system, such discrepancies may no longer be tolerated, absent a rational basis for such distinctions." Ibid."At the very least, the differences which distinguish the various programs implicate considerations of equal protection, particularly in counties in which no PTI programs have been established." Id. at 121, 363 A.2d 321. *939 Similarly, in State v. Brimage, 153 N.J. 1, 4, 706 A.2d 1096 (1998), the defendant argued the Attorney General's guidelines regarding plea-bargaining resulted in variant policies among the counties. The Court addressed whether those guidelines were adequate to meet the statutory goals of uniformity in sentencing. Id. at 5, 706 A.2d 1096. It recognized that some disparity in sentencing is inevitable, but found the "formalization of disparity from county to county" set forth in the challenged guidelines to be "clearly impermissible." Id. at 22, 706 A.2d 1096. Although the Court couched its analysis in terms of the statutory goal of uniform sentencing and separation of powers, rather than equal protection, it held the guidelines were invalid because they lead to "arbitrary and unreviewable differences between different localities." Id. at 23, 706 A.2d 1096.
A plain language reading of N.J.S.A. 2A:4A-43(c) is the best indicator of legislative intent. State v. Robinson, 217 N.J. 594, 604, 92 A.3d 656 (2014). Such a reading might well create entirely different standards of post-adjudication detention, based solely upon the arbitrary factor of geography. Some developmentally disabled juveniles would face the risk of short-term detention, whereas others would not, simply because of where they live or where the offense occurred. There is no discernable rational basis, let alone a compelling justification, to support a geographic cause *202 for depriving developmentally disabled juveniles of their fundamental right to liberty for up to sixty days.
The Legislature could not have intended to create an unconstitutional law by subjecting similarly situated juveniles to different risks of detention based solely upon an arbitrary factor like geography. This is especially true because the purposes of the Code are "fundamentally rehabilitative." State In re. J.L.A., 136 N.J. 370, 377, 643 A.2d 538 (1994) (quoting State In re. J.L.A., 262 N.J. Super. 78, 80, 619 A.2d 1321 (App. Div. 1993) ); see N.J.S.A. 2A:4A-21 (describing the purposes of the Code). "Geographical distinction has no basis in practical experience and is wholly unrelated to the rehabilitative objectives" of the Code. State v. Kowitski, 145 N.J. Super. 237, 242, 367 A.2d 459 (Law Div. 1976) (referring to the PTI program).
Under well-settled canons of statutory construction, we must go beyond the Code's plain language to salvage the law's constitutionality and effectuate legislative intent. Natale, 184 N.J. at 485-86, 878 A.2d 724. The Code must be read to prevent the post-adjudication detention of all developmentally disabled juveniles in any facility as long as all counties do not have access to short-term post-adjudication detention programs.
The provision requiring T.C. to serve thirty days in the OCJDC is reversed. We remand only for the entry of an amended dispositional order.
Reversed and remanded. We do not retain jurisdiction.

Should T.C. be on the verge of incarceration as a result of a violation of juvenile probation, we do not preclude the State from arguing that his condition does not fit within the statutory definition of "developmental disability" used in the Code. See N.J.S.A. 2A:4A-44(c)(2) and N.J.S.A. 30:6D-3(a)(1). We note that the Code does not incorporate four of the five statutory characteristics of "developmental disability," thereby increasing the number of qualifying individuals. See N.J.S.A. 30:6D-3(a)(2)-(5).

Juvenile Justice Commission, State of New Jersey, Office of the Attorney General, New Jersey Juvenile Detention Alternatives Initiative (JDAI) 2016 Annual Data Report 35, 42 (June 2017), http://www.nj.gov/oag/jjc/pdf/JDAI-2016-Report-Annual.pdf. Information as to Hunterdon and Salem Counties was provided by the Juvenile Justice Commission.

N.J.S.A. 2A:4A-43(c) suggests a broader issue not raised in this appeal. Discretionary short-term detention provisions are limited to county facilities. N.J.S.A. 2A:4A-43(c). Therefore, even non-developmentally disabled juveniles may be subject to disparate treatment based solely upon whether the county where the adjudication occurs maintains an approved detention facility or a contractual relationship with another county's approved commitment program. Such disparate treatment might implicate many of the constitutional concerns relevant to this appeal, but because resolving that issue is not necessary here, we do not reach it. State v. Zucconi, 50 N.J. 361, 364, 235 A.2d 193 (1967) ("We decline to consider a constitutional question ... in a case which does not require such a decision.").