JUSTICE ALBIN delivered the opinion of the Court.
**47 Juveniles adjudicated delinquent of certain sex offenses are barred for life from seeking relief from the registration and community notification provisions of Megan's Law. N.J.S.A. 2C:7-1 to -11, -19; N.J.S.A. 2C:7-2(g). That categorical lifetime bar cannot be lifted, even when the juvenile becomes an adult and poses no public safety risk, is fully rehabilitated, and is a fully productive member of society.
*919 Defendant C.K. was adjudicated delinquent for sex offenses committed more than two decades ago and now challenges the constitutionality of N.J.S.A. 2C:7-2(g)'s permanent lifetime registration and notification requirements as applied to juveniles.
Subsection (f) of N.J.S.A. 2C:7-2 subjects all sex offenders, including juveniles, to presumptive lifetime registration and notification **48 requirements. Unlike subsection (g), however, subsection (f) allows a registrant to seek relief from those requirements fifteen years after his juvenile adjudication, provided he has been offense-free and is "not likely to pose a threat to the safety of others." Subsection (g) imposes an irrebuttable presumption that juveniles, such as defendant, are irredeemable, even when they no longer pose a public safety risk and are fully rehabilitated.
The record in this case reveals what is commonly known about juveniles-that their emotional, mental, and judgmental capacities are still developing and that their immaturity makes them more susceptible to act impulsively and rashly without consideration of the long-term consequences of their conduct. See State v. Zuber, 227 N.J. 422, 152 A.3d 197 (2017). The record also supports the conclusion that juveniles adjudicated delinquent of committing sex offenses, such as C.K., who have been offense-free for many years and assessed not likely to reoffend, pose little risk to the public. Indeed, categorical lifetime notification and registration requirements may impede a juvenile's rehabilitative efforts and stunt his ability to become a healthy and integrated adult member of society.
We conclude that subsection (g)'s lifetime registration and notification requirements as applied to juveniles violate the substantive due process guarantee of Article I, Paragraph 1 of the New Jersey Constitution. Permanently barring juveniles who have committed certain sex offenses from petitioning for relief from the Megan's Law requirements bears no rational relationship to a legitimate governmental objective. In the absence of subsection (g), N.J.S.A. 2C:7-2(f) provides the original safeguard incorporated into Megan's Law: no juvenile adjudicated delinquent will be released from his registration and notification requirements unless a Superior Court judge is persuaded that he has been offense-free and does not likely pose a societal risk after a fifteen-year look-back period.
Defendant may apply for termination from the Megan's Law requirements fifteen years from the date of his juvenile adjudication, **49 and be relieved of those requirements provided he meets the standards set forth in N.J.S.A. 2C:7-2(f).
I.
A.
We begin with the juvenile offenses that triggered the registration and notification requirements in this case. When C.K. was approximately fifteen years old, he began sexually assaulting his younger adopted brother, A.K., who was then seven years old. After A.K. turned sixteen, he disclosed his older brother's abuse to his priest and then to the police.
The State charged C.K. with committing, while he was a juvenile, the offense of aggravated sexual assault against his adopted brother. At the time of the charge, C.K. was twenty-three years old.
The State moved to waive C.K. to the Criminal Part, Law Division, for trial as an adult. The State withdrew its waiver motion after C.K. agreed to plead guilty to the aggravated sexual assault charge in juvenile court. In his plea colloquy, C.K.
*920 admitted that when he was between the ages of fifteen and seventeen, he performed oral sex on his younger brother. In 2003, C.K. was sentenced to a three-year probationary term, conditioned on his attending sex-offender treatment and having no contact with his brother unless recommended by a therapist. The court also ordered C.K. to comply with the Megan's Law requirements and barred him from working with children without the court's permission.
The State classified C.K. as a Tier One offender-the lowest risk category for re-offense. See N.J.S.A. 2C:7-8(c)(1). As a Tier One offender, C.K. is required to register annually with the law enforcement agency in the municipality where he resides. See N.J.S.A. 2C:7-2 ; Attorney General Guidelines for Law Enforcement for the Implementation of Sex Offender Registration and **50 Community Notification Laws 9 (rev'd Feb. 2007) [hereinafter Attorney General Guidelines ].
In the years after turning eighteen, C.K. received an undergraduate degree in psychology from Catholic University and a master's degree in counseling from Montclair State University. At the time of his arrest, C.K. was a teacher's assistant for children with autism. After his juvenile adjudication, C.K. stopped working with children. By age thirty-three, C.K. had worked for many years at a nonprofit agency that provides adults suffering from mental illness a range of services, such as securing psychiatric treatment and affordable housing. C.K. has turned down opportunities for professional advancement from fear that a background check might "out" his status as a Megan's Law registrant. It has now been more than twenty years since C.K. engaged in any unlawful conduct and more than fourteen years since his juvenile adjudication.
B.
In 2008, five years after his juvenile adjudication, C.K. filed his first petition for post-conviction relief (PCR), seeking, among other things, a judicial declaration that the Megan's Law lifetime registration and notification requirements violated his constitutional rights. The PCR court denied the petition in its entirety. The Appellate Division affirmed the denial of C.K.'s petition, suggesting that an evidentiary record would be necessary to support his constitutional arguments.
In November 2012, C.K. filed his second PCR petition, alleging that his earlier PCR counsel provided ineffective assistance by failing to properly challenge the constitutionality of his Megan's Law requirements. The second PCR court held an evidentiary hearing. C.K. presented five expert witnesses who testified about the current body of research on juvenile sex offender recidivism. C.K. also offered psychological assessments about his mental, emotional, and career development during his adult life. The State **51 cross-examined C.K.'s witnesses but offered no rebuttal testimony or expert reports. The following summarizes the record before us.[1] *921 At the evidentiary hearing, C.K. called Dr. Jackson Tay Bosley, Dr. Sean Hiscox, Dr. Robert Prentky, and Dr. James Reynolds, clinical psychologists with expertise in the treatment and rehabilitation of both juvenile and adult sex offenders. Dr. Hiscox was additionally qualified as an expert in the risk assessment of adult and juvenile offenders. Nicole Pittman, Esq., testified about the effects of placing juvenile offenders on registries based on her nationwide research on the subject.
All of the expert witnesses asserted that juvenile sex offenders are more amenable to rehabilitation and less likely to reoffend than adult sex offenders. They stressed that juvenile offenders, because of their lack of maturity and delayed social and emotional development, are fundamentally different from adult offenders.
The experts pointed to multiple studies confirming that juveniles who commit sex offenses are more likely to act impulsively and be motivated by sexual curiosity, in contrast to adult sex offenders who are commonly aroused by deviant sexual behavior or engage in predatory or psychopathic conduct. See Elizabeth J. Letourneau & Michael H. Miner, Juvenile Sex Offenders: A Case Against the Legal and Clinical Status Quo, 17 Sexual Abuse: J. Res. & Treatment 293, 297-99 (2005); Human Rights Watch, Raised on the Registry: The Irreparable Harm of Placing Children on Sex Offender Registries in the US 27-29 (2013) [hereinafter **52 Human Rights Watch, Raised on the Registry ]. Dr. Hiscox explained that "adolescent sex offense recidivism rates are relatively low" when compared "with higher sex offense recidivism rates of individuals who commit sex offenses as adults." Dr. Bosley and other experts also noted that previous assumptions about high rates of juvenile sex offender recidivism as adults are inaccurate.
One recent study-cited by all five expert witnesses-analyzed sixty-three data sets with information about more than 11,200 juvenile sex offenders. The study averaged the data sets, some of which followed juvenile sex offenders for less than five years and others for more than five years, and concluded that the overall juvenile sex re-offense rate was seven percent. Michael F. Caldwell, Study Characteristics and Recidivism Base Rates in Juvenile Sex Offender Recidivism, 54 Int'l J. Offender Therapy & Comp. Criminology 197, 201-03 (2010).
According to a report of psychologist Dr. Philip Witt, the recidivism rate for those falling into C.K.'s risk assessment category is 1.1% over a two-year period and 2.0% over a four-year period. In that report, he indicated that "a sibling incest offender whose offense [was] in his early to mid-teens has little bearing on his risk" many years later.
None of the risk assessment statistics accounted for a juvenile sex offender who had been offense-free for a period of fifteen or more years since his adjudication. The experts, however, explained that juvenile sex offenders who commit subsequent sex offenses generally do so within the first few years following their last offense. See, e.g., James R. Worling et al., 20- Year Prospective Follow-Up Study of Specialized Treatment for Adolescents Who Offended Sexually, 28 Behav. Sci. & L. 54 (2010) ("[M]ost sexual and nonsexual recidivism occurs in the first few years after adolescents are initially assessed."). According to Dr. Hiscox, the longer a juvenile turned adult remains offense-free in the community, the lower the risk that he will re-offend.
The experts generally agreed that the best way to assess an offender's risk of *922 recidivism is with individualized assessments. As **53 Dr. Prentky explained, "Risk is not fixed, and it certainly can't be adequately captured by one single event in the life of ... an adolescent who is constantly changing."
Ms. Pittman observed that categorical lifetime registration requirements based on an aggravated sex offense conviction disproportionately impact juveniles. That is so because juveniles commonly commit sex offenses against their peers or somewhat younger children.[2] See Human Rights Watch, Raised on the Registry at 25 ("[R]ecent laws ... reserve the harshest punishments for those who target children without seeming to appreciate that child offenders, whose crimes almost always involve other kids, are particularly likely to be subjected to these harsher penalties.").
Last, according to the experts, studies reveal that registration policies do not necessarily reduce recidivism among juvenile sex offenders. See, e.g., Elizabeth J. Letourneau et al., The Influence of Sex Offender Registration on Juvenile Sexual Recidivism, 20 Crim. Just. Pol'y Rev. 136, 138, 143 (2009) (finding no significant difference in recidivism rates between registered and nonregistered juvenile male sex offenders over a nine-year period). Correspondingly, Ms. Pittman expressed her concern that inflexible lifetime registration requirements imposed on juveniles impede their rehabilitation and their quest for normal and productive lives in welcoming communities.
C.
The evidentiary hearing also focused on the experts' individualized risk assessments of C.K., now thirty-eight years old, and on **54 the negative impact the registration requirements continue to have on his ability to lead a normal life.
C.K. participated in several psychological assessments, including two with Dr. Witt. In his 2003 assessment, made shortly after C.K.'s arrest, Dr. Witt did not find any indication that "[C.K.'s] sexual behavior with his brother was part of a broader pattern of illegal sexual behavior." He considered C.K. "a low risk."
In 2009, Dr. Witt reevaluated C.K., then twenty-nine years old, and observed that C.K. was "an adult with a productive, appropriate lifestyle and healthy sexual adjustment" who presented a low risk to reoffend. Dr. Witt noted that the "risk assessment is really just a reflection of commonsense: When an individual's risk is relatively low to begin with and the individual has had a stable, offense-free lifestyle for many years, his current risk is minimal."
At the evidentiary hearing, Dr. Hiscox testified that C.K.'s 2013 psychological evaluation was "completely consistent with Dr. Witt's two risk assessments." Dr. Hiscox further observed that C.K. had "gone 16 to 20 years in the community without a new sexual or non-sexual offense" and the research was clear: "the longer an individual goes without committing a new sex offense while at liberty in the community, the lower his risk of reoffending."
That same year, in interviews with Ms. Pittman, C.K. expressed his feelings of isolation, anxiety, and depression resulting from his Megan's Law status. He also disclosed his sense of hopelessness, and his fear that his registrant status will interfere *923 with his ability to one day be a normal parent who can attend his children's sports games and school conferences.
II.
A.
The PCR court found the "evidence presented by [C.K.'s] psychologists [to be] credible and persuasive" and noted that **55 "[t]he State did not present any evidence to the contrary." The PCR court summarized some of the opinions reached by C.K.'s experts: (1) "[y]outh sex offenders differ from adult sex offenders" and "are more amenable to sex offender specific treatment"; (2) "the adolescent brain is not fully mature"; (3) an individualized risk-based assessment of a juvenile sex offender "adequately protects the public from recidivist sex offenders"; (4) a categorical offense-based bar unnecessarily precludes low-risk juvenile offenders who pose no threat to the community from relief from the Megan's Law registration requirements; and (5) the offense-based bar to relief is "not rationally related to the State's interest to protect persons from recidivist sex offenders."
The PCR court concluded, however, that any loosening of the strictures of Megan's Law must come from this Court in assessing the constitutionality of the registration scheme as applied to juveniles or from the Legislature, which has the paramount role in forging public policy. The PCR court expressed that it was constrained by the precedents of this Court and, on that basis, "the adverse consequences of Megan's Law registration" do not give rise to a constitutional issue. Finally, the PCR court held that C.K. did not satisfy the standard for proving ineffective assistance of prior counsel, under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) and State v. Fritz, 105 N.J. 42, 519 A.2d 336 (1987), because the failure to present earlier the testimony given at the evidentiary hearing would not have achieved a different outcome.
B.
In an unpublished opinion, a panel of the Appellate Division affirmed the denial of C.K.'s second PCR petition. The panel acknowledged that C.K.'s "constitutional arguments are compelling," but believed that this Court's decisions in Doe v. Poritz, 142 N.J. 1, 662 A.2d 367 (1995), and In re Registrant J.G., 169 N.J. 304, 777 A.2d 891 (2001), foreclosed any basis for relief. The panel indicated that "this case may present an appropriate occasion for **56 our Supreme Court to revisit J.G.," but, as an intermediate appellate court, it was bound to follow this Court's precedents.
We granted C.K.'s petition for certification "limited to the issue of the constitutionality of imposing the lifetime registration requirements of Megan's Law on juvenile offenders." 228 N.J. 238, 156 A.3d 163 (2016). We also granted the motions of the American Civil Liberties Union of New Jersey, Advocates for Children of New Jersey, and Northeast Juvenile Defender Center (collectively, ACLU-NJ), the Juvenile Law Center, the Office of the Public Defender, and the Attorney General of New Jersey to participate as amici curiae.
Our grant of certification is limited to addressing the constitutionality of N.J.S.A. 2C:7-2(g) as applied to juveniles, which, unlike subsection (f), imposes categorical lifetime registration requirements for certain sex offenses. We therefore do not consider the parties' general arguments that all juvenile offense-based registration requirements are constitutionally infirm because they do not assess the actual risk posed by an individual juvenile.
*924 III.
A.
C.K. contends that the Megan's Law lifetime registration requirements in N.J.S.A. 2C:7-2(g), as applied to juveniles, violate his federal and state constitutional rights to substantive due process and to be free from cruel and unusual punishment. C.K. claims that the registration scheme's irrebuttable presumption that juveniles who commit certain sex offenses are dangerous and irredeemable is at odds with the expert testimony presented at the PCR hearing, the neuroscience about the developing juvenile brain, and his own life story. He asserts that a lifetime registration scheme for juvenile sex offenders that makes no allowance for a juvenile's rehabilitation and low risk for re-offense is penal, not remedial, in nature and advances no legitimate governmental objective. He describes how the registration scheme erects barriers **57 to a juvenile's acceptance into society, career advancement, and personal happiness, despite, as in his case, an offense-free record and uniform expert testimony that he poses no safety risk. According to C.K., a risk-based assessment is sufficient to protect society's interest in public safety.
The ACLU-NJ, the Juvenile Law Center, and the Public Defender, as amici curiae, echo the arguments advanced by C.K. and raise additional points, some collectively and others individually. Amici emphasize that juvenile sex offenders are distinguishable from their adult counterparts due to their immaturity and lack of cognitive development, their amenability to rehabilitation, and their lower recidivism rate. N.J.S.A. 2C:7-2(g) imposes an undifferentiated disability on juvenile registrants, without regard to their actual risk, and therefore bears no relationship to a legitimate state interest. According to amici, rehabilitated juvenile sex offenders, while on the registry, face increased difficulties securing education, employment, and housing and suffer a stigma that has harmful psychological consequences.
B.
The State submits that "lifetime Megan's Law registration for juveniles adjudicated delinquent or convicted of certain offenses pass[es] constitutional muster" under Doe and J.G. The State maintains that C.K.'s concerns about imposing lifetime registration on adolescents "are appropriately directed at the Legislature" rather than this Court. It assails the studies relied on by C.K.'s experts, reporting low juvenile recidivism rates and high rehabilitative success, because they do not distinguish between the general class of juvenile sex offenders and the subclass of offenders affected by subsection (g)-those adjudicated of committing aggravated sexual assault, forcible sexual assault, or multiple sex offenses.
The State, moreover, claims that C.K. has presented largely theoretical harms and unfounded fears, given his status as a Tier One registrant not subject to the broader Megan's Law notification **58 requirements, and is not a proper class representative of all Tier registrants to challenge the constitutionality of N.J.S.A. 2C:7-2(g). Additionally, the State explains that its failure to present witnesses at the PCR hearing flowed from its belief that "the issue was settled" and should not be read as a concession that it agreed with C.K.'s experts.
The Attorney General, as amicus curiae, emphasizes many of the points made by the State. The Attorney General asserts the twofold purpose of the registration and notification scheme is to allow law enforcement to keep track of the whereabouts of sex offenders and to arm the public with *925 information concerning an offender's identity, location, and offense. This registration scheme, the Attorney General insists, is remedial, not punitive, and advances the goal of public safety. Finally, the Attorney General states that amending Megan's Law is the province of the Legislature, not this Court, and that C.K., and his amici, should bring the developing social science evidence to the attention of the branch of government responsible for public policy.
IV.
A.
We granted certification to address the constitutionality of imposing the Megan's Law lifetime registration and notification requirements on juveniles adjudicated of committing certain sex offenses, despite the peculiar procedural vehicle for doing so. Typically, we would not consider a constitutional challenge on a second PCR. See R. 3:22-4(b). However, "when a 'constitutional problem presented is of sufficient import to call for relaxation of the rules [related to post-conviction relief,] ... we may consider the question on its merits.' " State v. Franklin, 184 N.J. 516, 528, 878 A.2d 757 (2005) (alterations in original) (quoting State v. Johns, 111 N.J. Super. 574, 576, 270 A.2d 59 (App. Div. 1970) ). We have before us a full evidentiary record on a constitutional issue that both the trial court and Appellate Division found compelling.
**59 We therefore will not reject consideration of this important issue on procedural grounds. See ibid.
We begin our analysis with the statute at issue, with our focus on juvenile sex offenders.
N.J.S.A. 2C:7-2(g) provides that
[a] person required to register under this section who has been convicted of, adjudicated delinquent, or acquitted by reason of insanity for more than one sex offense as defined in subsection b. of this section or who has been convicted of, adjudicated delinquent, or acquitted by reason of insanity for aggravated sexual assault pursuant to subsection a. of [N.J.S.A.] 2C:14-2 or sexual assault [using physical force or coercion, without causing severe injury] is not eligible under subsection f. of this section to make application to the Superior Court of this State to terminate the registration obligation.
[ (emphases added).]
N.J.S.A. 2C:7-2(g) is part of the registration and community notification provisions of Megan's Law. N.J.S.A. 2C:7-1 to -11, -19.
The legislative rationale for the registration and notification scheme is public safety-to "permit law enforcement officials to identify and alert the public" about sex offenders who may pose a danger to children. N.J.S.A. 2C:7-1(a).
On adjudication of a sex offense identified in N.J.S.A. 2C:7-2(b), a juvenile offender must register with the police department in the municipality where he lives. N.J.S.A. 2C:7-2(c) ; New Jersey State Police, New Jersey Sex Offender Internet Registry: Frequently Asked Questions, http://www.njsp.org/sex-offender-registry/faqs.shtml (last visited Mar. 16, 2018). Registration requires the collection of an offender's fingerprints and such information as his residence, school enrollment, and employment. N.J.S.A. 2C:7-4(b)(1)-(2). The juvenile also must advise the appropriate law enforcement agency of whether he has access to a computer or device with internet capability, N.J.S.A. 2C:7-2(d)(2), and any change in residence, employment, or other required information, N.J.S.A. 2C:7-2(d)(1). A juvenile offender who fails to register or inform the appropriate law enforcement agency of a change of **60 address or other status is *926 guilty of a third-degree crime. N.J.S.A. 2C:7-2(a)(3) ; 2C:7-2(d).
For the purpose of determining the scope of public notification of a registrant's sex-offender status, Megan's Law registrants are categorized into three tiers based on an assessment of their risk of reoffending. N.J.S.A. 2C:7-8(c). Registrants classified as Tier One are deemed to have the lowest risk to reoffend and those classified as Tier Three are deemed to have the highest risk. Ibid.
For offenders in Tier One, notification is limited to "law enforcement agencies likely to encounter the person registered." N.J.S.A. 2C:7-8(c)(1). For offenders in Tier Two, notification extends to "organizations in the community including schools, religious and youth organizations." N.J.S.A. 2C:7-8(c)(2). For offenders in Tier Three, notification further extends to "members of the public likely to encounter the person registered," N.J.S.A. 2C:7-8(c)(3), such as those in private residences, businesses, schools, and community organizations in the areas where the offender lives and works. Attorney General Guidelines 17-18, 42-45. Although Tier Three juvenile offenders are placed on an online registry for notification purposes, Tier Two juvenile offenders are not, unless aggravating circumstances are present. N.J.S.A. 2C:7-13(b) and (d) ; Attorney General Guidelines 48-49. No Tier One offenders are included on the internet registry. Attorney General Guidelines 48-49.
The lifetime registration requirements imposed by N.J.S.A. 2C:7-2(g) are categorical. A juvenile, fourteen years or older, who has committed an enumerated sex offense, or multiple sex offenses, under subsection (g) cannot seek relief ever from those requirements-however successful his rehabilitation, however many his achievements, and however remote the possibility that he will reoffend.
B.
Subsection (g) of N.J.S.A. 2C:7-2 was not part of the original legislative scheme that became Megan's Law in 1994. The Legislature **61 enacted subsection (g) in 2002 with the intended purpose of conforming our State registration and notification scheme to Congress's 1996 amendments to the Jacob Wetterling Crimes Against Children and Sexually Violent Offender Registration Act of 1994 (Jacob Wetterling Act). Pub. L. No. 104-236, §§ 3-7, 110 Stat. 3096, 3097 (repealed 2006). The amended Jacob Wetterling Act-the federal counterpart to Megan's Law-required law enforcement agencies to notify the community when "necessary to protect the public." 42 U.S.C. § 14071(e)(2) (repealed 2006). Under the Act, offenders who committed certain enumerated sex crimes were subject to lifetime registration requirements. 42 U.S.C. § 14071(b)(6) (repealed 2006). That provision was cited by the New Jersey Legislature in enacting the permanent, offense-based bar contained in N.J.S.A. 2C:7-2(g). See S. Law & Pub. Safety Comm. Statement to S. 2714 (Nov. 29, 2001) (L. 2001, c. 392). The rationale behind the passage of subsection (g) evidently was to comply with federal law and ensure continued specified federal crime funding. See ibid. (explaining that "States that do not comply with [the Jacob Wetterling Act] will lose federal funding beginning in the year 2002").
The presence of subsection (g) of N.J.S.A. 2C:7-2 in our legislative scheme today, however, is not a precondition to the maintenance of federal funding. In 2006, Congress repealed the Jacob Wetterling Act and passed the Adam Walsh Child Protection and Safety Act (Adam Walsh Act). Pub. L. No. 109-248, 120 Stat. 587 (codified at 42 U.S.C. §§ 16901 -91 (repealing 42 U.S.C. §§ 14071 -73) ). Title I of the *927 Adam Walsh Act-known as the Sex Offender Registration and Notification Act (SORNA)-establishes a national baseline for sex offender registration and requires that states receiving federal crime funds substantially comply with the guidelines it outlines. See 34 U.S.C. § 20927 ; see also 34 U.S.C. § 10151 (establishing that non-compliant jurisdictions lose ten percent of funds from federal Edward Byrne Memorial Justice Assistance Grant Program). In effect, SORNA serves as model legislation that can be adopted in part or in whole by the states. Nevertheless, most states, including New Jersey, have not substantially **62 implemented SORNA. Office of Sex Offender Sentencing, Monitoring, Apprehending, Registering, and Tracking, SORNA Implementation Status, https://smart.gov/sorna-map.htm (last visited Mar. 16, 2018) (listing only twenty-two states and territories as having substantially implemented SORNA).
SORNA classifies sex offenders into three risk tiers-Tiers I, II, and III-for registration and notification purposes, depending solely on the nature of the offense. 34 U.S.C. § 20911. If New Jersey strictly followed federal law, C.K. would be classified as a Tier III offender based on his juvenile aggravated sexual assault adjudication. 34 U.S.C. § 20911(4)(A). The offender's tier assignment, in turn, determines the duration of his registration requirements. 34 U.S.C. § 20915(a). Unlike N.J.S.A. 2C:7-2(g), SORNA has no permanent lifetime registration provision for juveniles. A juvenile Tier III offender, although subject to presumptive lifetime registration, is eligible under SORNA to have his registration requirements terminated after twenty-five years if he has a "clean record." 34 U.S.C. § 20915(a)(3) to (b). Although Tier I and II offenders are subject to fifteen-year and twenty-five-year registration periods, respectively, Tier I offenders are allowed to apply for a shortened registration period. 34 U.S.C. § 20915(a) to (b).
Currently, under SORNA, states have discretion whether to include juveniles on their public sex-offender registry websites. Supplemental Guidelines for Sex Offender Registration and Notification, 76 Fed. Reg. 1630, 1636-37 (Jan. 11, 2011).[3] In 2016, the United States Attorney General implemented new SORNA guidelines governing juvenile offenders. See Supplemental Guidelines for Juvenile Registration Under the Sex Offender Registration and Notification Act, 81 Fed. Reg. 50,552 (Aug. 1, 2016). Under those guidelines, states that do not register juveniles who have committed serious sex offenses may still be compliant with SORNA
**63 if the federal government finds that those states have nonetheless "substantially implemented SORNA's juvenile registration requirements" through other means. Id. at 50,558.
Moreover, the United States Attorney General may exempt a state from implementing a provision of SORNA that "would place the jurisdiction in violation of its constitution, as determined by a ruling of the jurisdiction's highest court." 34 U.S.C. § 20927(b). In short, a state's highest court can declare unconstitutional a state's sex-offender registration provision without necessarily jeopardizing a state's federal funding.
C.
Before the passage of subsection (g) of N.J.S.A. 2C:7-2 in 2002, subsection (f) governed the termination of registration requirements *928 for all adult and juvenile sex offenders. N.J.S.A. 2C:7-2(f), which is still operative, provides that
a person required to register under this act[4] may make application to the Superior Court of this State to terminate the obligation upon proof that the person has not committed an offense within 15 years following conviction or release from a correctional facility for any term of imprisonment imposed, whichever is later, and is not likely to pose a threat to the safety of others.
Subsection (f) was part of the original Megan's Law registration and notification requirements, which we declared constitutional in Doe. 142 N.J. at 12-13, 662 A.2d 367.[5] In Doe, we rejected the argument that the registration and notification requirements constituted a form of punishment, finding instead that they are "remedial in purpose" and "designed simply and solely to enable the public to protect itself from the danger posed by sex offenders."
**64 Id. at 73, 662 A.2d 367. We held that the "Constitution does not prevent society from attempting to protect itself from convicted sex offenders, no matter when convicted, so long as the means of protection are reasonably designed for that purpose." Id. at 12, 662 A.2d 367 (emphasis added). The validity of subsection (f)'s presumptive lifetime registration requirements was not at issue in Doe. The Court noted that, under subsection (f), a fifteen-year offense-free registrant could have his registration requirements terminated if he could "persuade the court that he or she is not likely to pose a threat to the safety of others." Id. at 21-22, 662 A.2d 367 (citing N.J.S.A. 2C:7-2(f) ).
The underlying assumption of N.J.S.A. 2C:7-2(f) is that when a registrant, who has been offense-free for fifteen or more years, no longer poses a risk to the safety of the public, keeping him bound to the registration requirements no longer serves a remedial purpose.
In J.G., this Court grappled with the implication of applying the presumptive lifetime registration requirements of N.J.S.A. 2C:7-2(f) to juveniles under the age of fourteen. 169 N.J. 304, 777 A.2d 891. In that case, J.G. pled guilty in family court to committing a second-degree sexual assault. Id. at 309-10, 777 A.2d 891. At the time of the assault, J.G. was ten years old and the victim, his cousin, just eight years old. Id. at 309, 777 A.2d 891. The family court imposed a suspended indeterminate custodial sentence not to exceed three years, ordered J.G. to attend a family counseling program, and advised J.G. that he was subject to the Megan's Law lifetime registration and community notification requirements. Id. at 311-12, 777 A.2d 891.
The dilemma faced by the Court in J.G. was to reconcile the Megan's Law presumptive lifetime registration requirements with the Juvenile Code's "mandate to terminate all dispositions other than incarceration at age eighteen, or within three years, whichever is later." Id. at 334, 777 A.2d 891. Under N.J.S.A. 2C:7-2(f), J.G. could not move to lift the registration requirements until age **65 twenty-six, fifteen years following his delinquency adjudication. id="p929" href="#p929" data-label="929" data-citation-index="1" class="page-label">*929See id. at 319-20, 334, 777 A.2d 891.
We emphasized our Juvenile Code's continued focus on rehabilitation as evidenced by such dispositional alternatives as individual and family counseling, academic and vocational education, work programs, and community service. Id. at 321-27, 335, 777 A.2d 891. We also acknowledged the goals of Megan's Law, which focus on the need to protect society from sex offenders by disseminating critical information to the public. Id. at 339, 777 A.2d 891. In viewing the two statutory schemes, seemingly in conflict, we found "implausible and anomalous the notion that a child 'sex offender' such as J.G. should pursuant to Megan's Law be subject to a lifetime registration requirement merely on the basis of a delinquency adjudication that included no effort to assess his true culpability." Id. at 336, 777 A.2d 891.
In reconciling the rehabilitative goals of the Juvenile Code and the public safety goals of Megan's Law, we held that for an adjudicated juvenile sex offender under age fourteen, the "registration and community notification orders shall terminate at age eighteen," provided the juvenile can establish in the Law Division by "clear and convincing evidence that [he] is not likely to pose a threat to the safety of others." Id. at 337, 777 A.2d 891.
In setting age fourteen as the dividing line, we focused on the different treatment the Juvenile Code affords youths below and above that age. Id. at 335-36, 777 A.2d 891. We stressed that treating juveniles under the age of fourteen differently "is essential if we are to sensibly reconcile the Juvenile Code with Megan's Law." Id. at 335, 777 A.2d 891. In light of our disposition, we rejected J.G.'s argument that Megan's Law constitutes cruel and unusual punishment under our Federal and State Constitutions. Id. at 339, 777 A.2d 891.
Importantly, at the time Doe and J.G. were decided, all juveniles adjudicated of a sex offense could terminate their Megan's Law requirements after a period of fifteen years, provided they satisfied the criteria laid out in subsection (f) of N.J.S.A. 2C:7-2.
**66 See J.G., 169 N.J. at 319-20, 777 A.2d 891 ; Doe, 142 N.J. at 21, 662 A.2d 367. Neither Doe nor J.G. addressed whether permanent lifetime registration and notification requirements imposed on a juvenile would violate the substantive due process guarantee of our State Constitution.
D.
Less than a year after our J.G. decision in 2001, for the reasons previously discussed, the Legislature enacted the permanent, irrevocable lifetime registration requirements in subsection (g) that are applicable to adult as well as juvenile offenders. L. 2001, c. 392 § 1. In this case, our focus is only on those juveniles between the ages of fourteen and seventeen adjudicated delinquent in family court for sex offenses falling within the ambit of subsection (g). We agree with the Appellate Division's determination in In re Registrant L.E. that the Legislature did not intend to override the rights provided in J.G. to juvenile sex offenders under age fourteen who are authorized to seek termination of their registration and notification requirements at age eighteen. 366 N.J. Super. 61, 64-65, 840 A.2d 850 (App. Div. 2003). Notably, since 2003 the Legislature has not enacted legislation that would signal disagreement with L.E. See Smith v. Fireworks by Girone, Inc., 180 N.J. 199, 215, 850 A.2d 456 (2004) ("[T]he construction of a statute by the courts, supported by long acquiescence on the part of the Legislature ... is evidence that such construction is in accord with the legislative intent." (quoting Quaremba v. Allan, 67 N.J. 1, 14, 334 A.2d 321 (1975) ) ).
Neither Doe nor J.G. provides guidance for the resolution of the substantive due *930 process challenge to subsection (g) as applied to juveniles. The implicit assumption underlying subsection (g) is that a juvenile, once adjudicated of certain sex offenses, will forever pose a danger to the safety of others, despite the offense-free and productive life he may lead in the future. C.K. challenges that assumption and the constitutionality of a statutory provision that has no risk-based assessment for continued registration and notification **67 requirements fifteen years following his juvenile adjudication.
V.
A.
Our laws and jurisprudence recognize that juveniles are different from adults-that juveniles are not fully formed, that they are still developing and maturing, that their mistakes and wrongdoing are often the result of factors related to their youth, and therefore they are more amenable to rehabilitation and more worthy of redemption. Our juvenile justice system is a testament to society's judgment that children bear a special status, and therefore a unique approach must be taken in dealing with juvenile offenders, both in measuring culpability and setting an appropriate disposition. Indeed, the United States Supreme Court has explained that juvenile courts were created "to provide measures of guidance and rehabilitation for the child and protection for society, not to fix criminal responsibility, guilt and punishment." Kent v. United States, 383 U.S. 541, 554, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966).
Among the purposes of the Juvenile Code, N.J.S.A. 2A:4A-20 to -92, is "to remove from children committing delinquent acts certain statutory consequences of criminal behavior, and to substitute therefor an adequate program of supervision, care and rehabilitation, and a range of sanctions designed to promote accountability and protect the public." N.J.S.A. 2A:4A-21(b). Although rehabilitation, historically, has been the primary focus of the juvenile justice system, a second purpose-increasingly so in recent times-is protection of the public. See State in Interest of K.O., 217 N.J. 83, 92-93, 85 A.3d 938 (2014) ; see also J.G., 169 N.J. at 320-21, 777 A.2d 891 (noting that soon after enactment of Megan's Law, Legislature amended Juvenile Code's statement of purpose to include "a range of sanctions designed to promote accountability and protect the public" (quoting N.J.S.A. 2A:4A-21 ) );
**68 State in Interest of M.C., 384 N.J. Super. 116, 128, 894 A.2d 60 (App. Div. 2006) (noting that rehabilitation and protection of society are among considerations family court must weigh).
Nevertheless, rehabilitation and reformation of the juvenile remain a hallmark of the juvenile system, as evidenced by the twenty enumerated dispositions available to the family court in sentencing a juvenile adjudicated delinquent. See N.J.S.A. 2A:4A-43(b) ; State in Interest of C.V., 201 N.J. 281, 295, 990 A.2d 640 (2010). The range of dispositional options signifies that a " 'one size fits all' approach" does not apply in the juvenile justice system. C.V., 201 N.J. at 296, 990 A.2d 640 (citing State of New Jersey, Office of the Child Advocate, Reinvesting in New Jersey Youth: Building on Successful Juvenile Detention Reform 16 (2009) ). The juvenile system's flexibility in selecting an appropriate disposition for a young offender allows the family court to take into account "the complex, diverse, and changing needs of youth" and to address "the unique emotional, behavioral, physical, and educational problems of each juvenile before the court." Id. at 296, 990 A.2d 640.
*931 B.
In a series of landmark cases, the United States Supreme Court declared unconstitutional legal regimes that imposed capital punishment on juvenile offenders, Roper v. Simmons, 543 U.S. 551, 568-70, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) ; life without parole on juveniles convicted of non-homicide offenses, Graham v. Florida, 560 U.S. 48, 82, 130 S.Ct. 2011, 176 L.Ed.2d 825 (2010) ; and mandatory life without parole on juveniles convicted of homicide offenses, Miller v. Alabama, 567 U.S. 460, 489, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012). In striking down each of those statutory schemes, relying on the Eighth Amendment's ban on cruel and unusual punishment, the Court grounded its decisions on commonly accepted scientific and sociological notions about the unique characteristics of youth and the progressive emotional and behavioral development of juveniles. We reviewed the breadth of the social science in Zuber, in which we held that sentencing judges **69 must consider "the mitigating qualities of youth" when imposing consecutive prison sentences that are the "practical equivalent of life without parole." 227 N.J. at 429, 152 A.3d 197 (quoting Miller, 567 U.S. at 478, 132 S.Ct. 2455 ).
Based on scientific and sociological studies, the United States Supreme Court and this Court have acknowledged that (1) "[a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults," Roper, 543 U.S. at 569, 125 S.Ct. 1183 (alteration in original) (quoting Johnson v. Texas, 509 U.S. 350, 367, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993) ); (2) "juveniles are more vulnerable or susceptible to negative influences" and "have less control ... over their own environment," ibid. (citation omitted); and (3) the personality and character traits of juveniles "are more transitory, less fixed," and "not as well formed as that of an adult," id. at 570, 125 S.Ct. 1183. See Zuber, 227 N.J. at 439-40, 152 A.3d 197. Scientific studies reveal that "parts of the brain involved in behavior control continue to mature through late adolescence," accounting for one of the "fundamental differences between juvenile and adult minds." Graham, 560 U.S. at 68, 130 S.Ct. 2011 ; see also Miller, 567 U.S. at 472 n.5, 132 S.Ct. 2455 ("It is increasingly clear that adolescent brains are not yet fully mature in regions and systems related to higher-order executive functions such as impulse control, planning ahead, and risk avoidance." (citations omitted) ). As a result, "[j]uveniles are more capable of change than are adults, and their actions are less likely to be evidence of 'irretrievably depraved character.' " Graham, 560 U.S. at 68, 130 S.Ct. 2011 (quoting Roper, 543 U.S. at 570, 125 S.Ct. 1183 ). Because juveniles are in a state of becoming, they " 'have a greater claim than adults to be forgiven for failing to escape negative influences in their whole environment,' and there is 'a greater possibility ... that a minor's character deficiencies will be reformed.' " Zuber, 227 N.J. at 440, 152 A.3d 197 (alteration in original) (quoting Roper, 543 U.S. at 570, 125 S.Ct. 1183 ).
In finding unconstitutional juvenile life sentences without parole in non-homicide cases, the United States Supreme Court concluded **70 that just because a juvenile defendant "posed an immediate risk" at one point in his young life does not mean that he will "be a risk to society for the rest of his life." Graham, 560 U.S. at 73, 130 S.Ct. 2011. The Court held that a life without parole sentence denies a juvenile "some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." Id. at 75, 130 S.Ct. 2011. The Court also struck down the imposition of a mandatory sentence of life without parole in juvenile homicide cases *932 because the disposition precludes any "consideration of [a juvenile's] chronological age and its hallmark features-among them, immaturity, impetuosity, and failure to appreciate risks and consequences." Miller, 567 U.S. at 477, 132 S.Ct. 2455.
In the wake of Roper, Graham, and Miller, we held in Zuber that sentencing judges must consider "the mitigating qualities of youth" and "exercise a heightened level of care before they impose multiple consecutive sentences on juveniles which would result in lengthy jail terms." 227 N.J. at 429-30, 152 A.3d 197. We encouraged "the Legislature to consider enacting a statute that would provide for later review of juvenile sentences that have lengthy periods of parole ineligibility."[6] Id. at 430, 152 A.3d 197.
C.
Other state courts of last resort that have addressed the constitutionality of long-term registration and notification requirements imposed on juvenile sex offenders offer guidance.
In In re C.P., the Ohio Supreme Court declared an Ohio statute that subjected certain juvenile offenders to automatic and mandatory lifetime sex-offender registration and notification requirements-with the potential for reclassification after twenty-five years-violative of the cruel-and-unusual-punishment and due-process clauses of the Federal and Ohio Constitutions.
**71 131 Ohio St.3d 513, 967 N.E.2d 729, 732, 737 (2012). In that case, C.P., age fifteen, was adjudicated delinquent of kidnapping and raping a six-year old male relative. Id. at 732. The juvenile court sentenced C.P. to a minimum three-year period of commitment to the Ohio Department of Youth Services. Id. at 733. Under an Ohio statute, which adopted federal SORNA, C.P. was automatically classified as a Tier III sex offender, which required him to register with the sheriff every ninety days and to comply with community notification requirements. Id. at 733-34, 738-39. The notification requirements not only authorized the dissemination of C.P.'s photograph and personal information to neighbors, schools, and various agencies and organizations, but also the placement of C.P. on the electronic sex-offender database. Id. at 736.
In striking down the statute on constitutional grounds, the Ohio Supreme Court reasoned: (1) the lifetime registration and notification requirements are imposed at an age when the juvenile offender's character is not yet fixed; (2) the "statutory scheme gives the juvenile judge no role in determining how dangerous a child offender might be or what level of registration or notification would be adequate to preserve the safety of the public"; and (3) "the juvenile judge never gets an opportunity to determine whether the juvenile offender has responded to rehabilitation or whether he remains a threat to society." Id. at 741-42, 749. The Court observed that "[f]ew labels are as damaging in today's society as 'convicted sex offender' " and that sex offenders are " 'the lepers of the criminal justice system.' " Id. at 746 (quoting Phoebe Geer, Justice Served? The High Costs of Juvenile Sex Offender Registration, 27 Dev. Mental Health L. 33, 47 (2008) ). The Court determined that "[l]ifetime registration and notification requirements run contrary to [the law's] goals of rehabilitating the offender and aiding his mental and physical development." Id. at 742.
Similarly, the Pennsylvania Supreme Court declared that Pennsylvania's statute *933 imposing lifetime registration and notification requirements on sexually violent juvenile offenders violated the **72 state constitution's due process guarantee. In re J.B., 630 Pa. 408, 107 A.3d 1, 2, 10, 14-16 (2014). The Pennsylvania statute authorized termination of the registration requirements after twenty-five years, provided the juvenile could establish he did not reoffend within that period, successfully completed a rehabilitation program and court-ordered supervision, and was "not likely to pose a threat to the safety of any other person." Id. at 7-8 (quoting 42 Pa. Cons. Stat. § 9799.17(b)(2) ). Like the Ohio statute, Pennsylvania's statute is modeled after the federal SORNA statute. See id. at 3. Nevertheless, the Pennsylvania high court held that the sex-offender registration statute violated the due process rights of juvenile offenders "by utilizing the irrebuttable presumption that all juvenile offenders 'pose a high risk of committing additional sexual offenses.' " Id. at 14 (quoting 42 Pa. Cons. Stat. § 9799.11(a)(4) ). The court explained that an irrebuttable presumption doctrine should not apply when a "presumption is not universally true and a reasonable alternative means currently exists for determining which juvenile offenders are likely to reoffend." Ibid.
In J.B., the Pennsylvania Supreme Court held that the registration statute's "presumption that sexual offenders pose a high risk of recidivating is not universally true when applied to juvenile offenders" because, as studies suggest, "many of those who commit sexual offenses as juveniles do so as a result of impulsivity and sexual curiosity, which diminish with rehabilitation and general maturation." Id. at 17. The court concluded that the registration statute's other parts, authorizing individualized assessments for determining which juveniles posed a high risk of reoffending, provided a reasonable alternative to the use of a discredited presumption. Id. at 19-20.
VI.
We now determine whether the categorical lifetime registration and notification requirements imposed on juvenile offenders by **73 N.J.S.A. 2C:7-2(g) passes muster under the substantive due process guarantee of our State Constitution.
Article I, Paragraph 1 of the New Jersey Constitution provides:
All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property, and of pursuing and obtaining safety and happiness.
[ N.J. Const. art. I, ¶ 1.]
That paragraph "sets forth the first principles of our governmental charter-that every person possesses the 'unalienable rights' to enjoy life, liberty, and property, and to pursue happiness." Lewis v. Harris, 188 N.J. 415, 442, 908 A.2d 196 (2006). Those basic rights cannot be abridged by arbitrary government action. See Robinson v. Cahill, 62 N.J. 473, 491-92, 303 A.2d 273 (1973). Although our State Constitution nowhere expressly states that every person shall be entitled to substantive due process of law, the expansive language of Article I, Paragraph 1 embraces that fundamental guarantee. Caviglia v. Royal Tours of Am., 178 N.J. 460, 472, 842 A.2d 125 (2004) (citing Greenberg v. Kimmelman, 99 N.J. 552, 568, 494 A.2d 294 (1985) ). The guarantee of substantive due process requires that a statute reasonably relate to a legitimate legislative purpose and not impose arbitrary or discriminatory burdens on a class of individuals. See Greenberg, 99 N.J. at 563, 494 A.2d 294. Although all laws are presumed to be constitutional, *934 no law can survive scrutiny under Article I, Paragraph 1 unless it has a rational basis in furthering some legitimate state interest. See ibid. Therefore, a statute that bears no rational relationship to a legitimate government goal and that arbitrarily deprives a person of a liberty interest or the right to pursue happiness is unconstitutional.
With those fundamental principles in mind, we conclude that N.J.S.A. 2C:7-2(g) violates the substantive due process rights of juvenile sex offenders.
**74 VII.
A.
We first acknowledge that since the passage of N.J.S.A. 2C:7-2(g) in 2002, scientific and sociological studies have shined new light on adolescent brain development and on the recidivism rates of juvenile sex offenders compared to adult offenders. Our commonsense and historical understanding that children are different from adults is enshrined in our juvenile justice system and fortified by recent United States Supreme Court decisions and Zuber, which embraced those studies that found that juveniles do not possess immutable psychological or behavioral characteristics. That body of jurisprudence and the evidentiary record in this case tell us that adolescents are works in progress and that age tempers the impetuosity, immaturity, and shortsightedness of youth. They tell us that, generally, juvenile sex offenders are less likely to reoffend than adult sex offenders and that the likelihood of recidivism is particularly low for those who have not reoffended for a long period of time. They tell us that the permanent status of sex-offender registrant will impair a juvenile, as he grows into adulthood, from gaining employment opportunities, finding acceptance in his community, developing a healthy sense of self-worth, and forming personal relationships. In essence, the juvenile registrant will forever remain a social pariah.
N.J.S.A. 2C:7-2(g) is grounded on the irrebuttable presumption that juveniles adjudicated delinquent for committing certain sex offenses will forever pose a danger to society. That irrebuttable presumption disregards any individual assessment of whether a particular registrant is likely to reoffend, long after the adjudication and long after the juvenile has become an adult. Those juveniles are, in effect, branded as irredeemable-at a point when their lives have barely begun and before their personalities are fully formed. They must carry this stigma even if they can prove that they pose no societal threat. But that irrebuttable lifetime presumption is not supported by scientific and sociological studies **75 or our jurisprudence and is not needed given the fifteen-year look back required by subsection (f).
Even a lifetime presumption with a twenty-five-year look-back period has been found violative of some states' constitutions. New Jersey's lifetime presumption of dangerousness that attaches to juvenile sex offenders pursuant to N.J.S.A. 2C:7-2(g) is more extreme than the registration and notification schemes, as applied to juveniles, struck down by the Ohio and Pennsylvania Supreme Courts. See C.P., 967 N.E.2d at 732, 737 ; J.B., 107 A.3d at 2, 17. The Ohio and Pennsylvania schemes, which allowed juvenile sex offenders to seek the lifting of registration and notification requirements after the passage of twenty-five years, were deemed constitutionally offensive because the classifications were not based on ongoing individual risk assessments. C.P., 967 N.E.2d at 741-42 ; J.B., 107 A.3d at 17. N.J.S.A. 2C:7-2(g) is even out of step with federal SORNA, which has no permanent lifetime registration provision for juveniles. A juvenile Tier III offender under the federal enactment is subject to a presumptive lifetime registration *935 but, after twenty-five years, is eligible to have his registration requirements terminated. 34 U.S.C. § 20915(a)(3) to (b).
Subsection (g) of N.J.S.A. 2C:7-2, moreover, cannot be viewed in isolation from other provisions of the statute. Subsection (f) imposes presumptive lifetime registration and notification requirements for sex offenses covered by subsection (g) but allows for a juvenile sex offender to be relieved of those requirements fifteen years after his juvenile adjudication or release from a correctional facility, provided he has been offense-free and "is not likely to pose a threat to the safety of others." Thus, under subsection (f), those juvenile sex offenders who have reoffended or pose a continuing threat after fifteen years will not be relieved of their registration and notification requirements. Subsection (g) has the perverse effect of keeping on the sex-offender registry those juveniles who have completed their rehabilitation, not reoffended, and who can prove after a fifteen-year look-back period that they are not likely to pose a societal threat. When, in the case of **76 juveniles, the remedial purpose of Megan's Law-rehabilitation of the offender and protection of the public-is satisfied, then the continued constraints on their lives and liberty pursuant to subjection (g), long after they have become adults, takes on a punitive aspect that cannot be justified by our Constitution.
It is at that point that subsection (g), as applied to juveniles, no longer bears a rational relationship to a legitimate state purpose and arbitrarily denies those individuals their right to liberty and enjoyment of happiness guaranteed by Article I, Paragraph 1 of the New Jersey Constitution.
It also bears emphasizing that holding that subsection (g) runs afoul of a fundamental right guaranteed under our State Constitution will not likely jeopardize any federal funding to this State. First, as mentioned earlier, subsection (g) is more severe and inflexible than the Tier III provisions of the federal SORNA. Second, a state is likely exempt from the federal SORNA's dictates when implementing one of its provisions is violative of a state's constitution, "as determined by a ruling of the jurisdiction's highest court." 34 U.S.C. § 20927(b).
B.
C.K.'s case in many ways exemplifies why subsection (g) does not bear a reasonable relationship to a legitimate state purpose when applied to juvenile offenders. Twenty years have passed since C.K. committed his offense as a juvenile, and his adjudication occurred more than fourteen years ago. C.K. is now thirty-eight years old and has not committed an offense in twenty years and none since his juvenile delinquency adjudication. Over the years, he has complied with his Megan's Law responsibilities. He has graduated from college and received a master's degree in counseling, remained gainfully employed working for a nonprofit agency that provides services for adults suffering from mental illness, and has been a contributing member of his community. Multiple psychological evaluations attest that he is an extremely low risk to reoffend.
**77 Nevertheless, C.K. remains a sex-offender registrant. That tainted status has permeated various spheres of his life-professional, personal, and social. He often feels isolated and depressed. He has turned down opportunities for professional advancement for fear that his juvenile sex-offender registrant status will be revealed. He despairs that the permanent designation of sex-offender registrant will impair his ability to fully participate in the lives of his children, if he one day has a family.
Solely because of the nature of the offense he committed as a juvenile, C.K. is presumed under subsection (g) to be a *936 permanent, lifetime risk to the safety of the public. That irrebuttable presumption, however, is not supported by scientific or sociological studies, our jurisprudence, or the record in this case. Because it does not further a legitimate state interest when applied to juveniles, subsection (g) does not withstand scrutiny under Article I, Paragraph 1 of our State Constitution.[7]
VIII.
For the reasons expressed, we hold that N.J.S.A. 2C:7-2(g) is unconstitutional as applied to juveniles adjudicated delinquent as sex offenders. Under subsection (f) of N.J.S.A. 2C:7-2, fifteen years from the date of his juvenile adjudication, C.K. will be eligible to seek the lifting of his sex-offender registration requirements. At that time, he must be given the opportunity to demonstrate by clear and convincing evidence that he has not reoffended and no longer poses a threat to others and therefore has a right to be relieved of his Megan's Law obligations and his status as a sex-offender registrant.

Notification of the constitutional challenge was provided to the Attorney General's Office, which declined to participate in the PCR proceeding. At oral argument before this Court, neither the Bergen County Prosecutor, appearing for the State, nor the Attorney General, appearing as amicus curiae, identified any additional evidence that contradicted the testimony presented at the PCR hearing. We gave the Attorney General's Office an additional opportunity to "bring to the Court's attention expert evidence that is contrary to the expert testimony presented to the PCR court with respect to the application of N.J.S.A. 2C:7-2(g) with respect to juveniles." The Attorney General's Office responded with a proffer of the expert testimony it would "potentially" offer. The information was too speculative and therefore not helpful to the Court.

Under N.J.S.A. 2C:14-2(a)(1), an adult or juvenile is guilty of aggravated sexual assault if he commits an act of sexual penetration with a person who is less than thirteen years old. Therefore, a thirteen-year old who sexually penetrates a person under the age of thirteen, pursuant to that statute, is guilty of aggravated sexual assault as a juvenile.

Initially, SORNA required online public notification for certain juvenile sex offenders. National Guidelines for Sex Offender Registration and Notification, 73 Fed. Reg. 38,030, 38,040 -41 (July 2, 2008).

"A person who has been convicted, adjudicated delinquent or found not guilty by reason of insanity for commission of a sex offense ... shall register as provided ...." N.J.S.A. 2C:7-2(a)(1).

While the Court generally held that Megan's Law is constitutional, we mandated due process hearings to afford registrants judicial review of both their proposed tier designations and the scope of community notification. Id. at 28-32, 107-08, 662 A.2d 367.

We also noted that other states had already enacted statutes that permitted a retrospective review of lengthy juvenile sentences. Zuber, 227 N.J. at 452 n.4, 152 A.3d 197.

In light of this disposition, we need not address C.K.'s claims that subsection (g) violates the Eighth Amendment's prohibition against cruel and unusual punishment and the New Jersey Constitution's corollary provision under Article I, Paragraph 12.